**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| Gold Hill Enterprises, LLC, | ) | Case No. 11-02458-hb |
| | ) | |
| Debtor. | ) | |

**DEBTOR'S MEMORANDUM IN SUPPORT OF ORDER
AUTHORIZING THE SALE OF ASSETS OF THE DEBTOR FREE AND CLEAR
OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS
PURSUANT TO 11 U.S.C. § 363**

Gold Hill Enterprises, LLC ("Gold Hill" or "Debtor"), the debtor-in-possession herein, has filed a Notice and Application (the "Application") for the entry of an order approving the terms of a proposed sale of a portion of the Debtor's real property in York County, South Carolina, as more fully described in the Land Purchase Agreement ("LPA") attached hereto as **Exhibit A**, to Fort Mill School District No. 4 ("School District" or "Buyer"), for the aggregate net purchase price of $2,900,000 ("Purchase Price"), as forth in the LPA. The proposed sale is subject to higher or otherwise better offers, on substantially similar terms, with such sale being free and clear of all liens, claims, encumbrances, and other interests, pursuant to 11 U.S.C. §§ 105 and 363.

Along with the Application, the Debtor filed a motion for expedited hearing. The motion was granted, and a hearing has been scheduled for April 22, 2011, at 2:00 p.m., with objections to be served on the Debtor's counsel no later than 10:00 a.m. on April 22.

In support of the Application, the Debtor represents as follows:

**BACKGROUND**

1.    Gold Hill is a limited liability company organized to develop and sell certain real property located in York County, South Carolina. Gold Hill owns

1

approximately 109 acres of property consisting of two (2) finished buildings (12,000 square foot building and 22,000 square foot building, respectively) on approximately 2.55 acres; four (4) graded pad ready sites (pads for 21,000 square foot building, 13,124 square foot building, 13,140 square foot building, and 20,000 square foot building) on approximately 5.286 acres; a 95.608 acre tract of rough graded land; and a 5.6 acre parcel that is pad ready for a 65,992 square foot building.

2. The property now owned by Gold Hill was originally family property owned by the parents of David Jennings and Kathryn Jennings (the "Jennings"). The Jennings had a contract for the sale of the entire property in bulk in 2001. The sale was set to close on September 11, 2001, but was derailed when tragedy struck the nation on that day.

3. In the years that followed, the Jennings decided to develop some of the family property, and to that end they created Gold Hill in 2005 with a third individual, Shawn Helda ("Helda"). The Jennings contributed the property, and Helda was to contribute development expertise. Per the operating agreement, all decisions of the LLC had to be approved by two managers, one of whom had to be Helda. The Jennings kept some of the family property in a separate partnership entity, called Jennings Enterprises.

4. Unfortunately, this management structure of Gold Hill proved to be difficult and was fraught with conflict. Coupled with the downturn in the economy, and particularly the real estate industry in 2007, Gold Hill found it more and more difficult to secure sales, even though the property itself was desirable and in a desirable location.

5. In 2007, Gold Hill took out two (2) loans with The National Bank of South Carolina, now known as Synovus Bank (the "Bank"), secured by the Gold Hill property. The current indebtedness on the Bank's loans is $6,335,101.16.

6. In September 2009, Gold Hill and Jennings Enterprises conducted an auction of all of their property, with the knowledge and consent of the Bank. Although there were successful bidders, and although the Bank had indicated that there would be no problem with the absolute auction format and no problem releasing the parcels from its mortgage, the Bank failed to release the parcels. As a result, the sales could not close, and three (3) lawsuits have been filed and are pending against Gold Hill for specific performance and damages.

7. During this same time, Helda had an outstanding loan obligation to the Bank, secured by property that he owned which was adjacent to the Jennings Enterprises property. In October 2009, the Bank demanded that Jennings Enterprises cross-collateralize its property with the Helda property. Because there was no joint ownership with the Helda property and the Jennings had no liability for Helda's debts, Jennings Enterprises declined to cross-collateralize. Ultimately Helda stopped making payments to the Bank. The Bank then foreclosed on the Helda property.

8. In December 2009, the Bank indicated that it would work with Gold Hill on an extension and forbearance of the loans if Gold Hill would remove Helda from management. As a result, the Jennings attempted to reach a settlement agreement with Helda. Ultimately, the Jennings and Helda reached an agreement which required the Bank to release 10 acres of the Gold Hill property to Helda in settlement of his interest in Gold Hill. Although every requirement of the Bank was met, the Bank refused to release

the 10 acres in order to allow the settlement to be consummated and to remove Helda as manager.

9. Negotiations between Gold Hill and the Bank deteriorated, and the Bank instituted a foreclosure action against Gold Hill on July 28, 2010 (the "Foreclosure"). During the pendency of the Foreclosure, Gold Hill continued negotiations with the Bank to try to reach a resolution of the issues, including the Bank's request that Helda be removed as manager. In fact, although the Bank obtained its judgment of foreclosure in December of 2010, it did not immediately notice the foreclosure sale because of the ongoing negotiations.

10. On or about January 19, 2011, Gold Hill and the School District entered into a Land Purchase Agreement for the purchase of that certain property set forth in the LPA for the aggregate net purchase price of $2,900,000. The closing on such sale was to occur on or before February 15, 2011. The Bank was aware of the proposed sale and Gold Hill was attempting to reach an agreement with the Bank on the release price for the parcel.

11. The parties subsequently agreed to extend the closing date for the sale, and entered into the LPA on or about April 4, 2011, which LPA extended the closing date to April 26, 2011.

12. The property subject to the sale includes two (2) buildings on 2.92 acres and an additional tract of approximately fourteen (14) acres (together, the "Subject Property").

13. The Foreclosure included the Subject Property, as well as additional property of the Debtor consisting of approximately 86 acres (together, the "Bank

Collateral"), all of which is adjacent and located off of Gold Hill Road in Fort Mill, South Carolina.

14. Gold Hill was not able to reach an agreement with the Bank on a release price for the Subject Property, and the Foreclosure sale took place on April 4, 2011. At that sale, the Bank entered a credit bid in the amount of $5,193,000 for the Bank Collateral. Having requested a deficiency, the sale remains open for thirty (30) days and is not a final sale.

15. Upon information and belief, although the Bank Collateral is sufficient to satisfy Gold Hill's outstanding loan, and particularly in light of the value of the property as demonstrated by the proposed sale, the Bank seeks to obtain the Bank Collateral in order to bolster the value of the Helda property which the Bank obtained through foreclosure.

16. The Debtor filed its petition for relief on April 14, 2011, and the Foreclosure is stayed pursuant to 11 U.S.C. § 362.[1]

17. The Debtor seeks approval for the sale of the Subject Property through the Application. The Application proposes the sale of the Subject Property as set forth in more detail in the LPA.

18. The following creditors assert a secured claim in the Subject Property: (1) Unpaid *ad valorem* taxes are due to York County on the property in the approximate amount of $203,000 (the amount includes estimated rollback taxes); and (2) the Bank

---

[1] Prior to the filing of the Petition, the Operating Agreement of Gold Hill was amended with Helda's consent such that Helda's consent as a manager is not required during the bankruptcy. Thus, the difficulties that Gold Hill previously faced in management has been alleviated to allow for a successful reorganization.

5

holds two mortgages on the property in the total amount of $6,335,101.16, which mortgages are secured by additional property that is not included in this proposed sale.

## **PROPOSED SALE**

19. On April 4, 2011, Gold Hill and the School District entered into the LPA attached hereto.

20. Pursuant to the LPA, the School District offers to pay the aggregate net amount of $2,900,000 ("Purchase Price").

21. The Debtor believes the Purchase Price is the highest and best recovery the Debtor can expect to receive for the Subject Property, and that it represents a greater value than could be obtained otherwise for the Subject Property.

22. Closing is scheduled to occur on or before April 26, 2011 as set forth in the LPA, and the Debtor is prepared to close on the sale as soon as reasonably practical following approval by the Court.

23. The proposed sale to the School District shall be free and clear of all liens, claims, encumbrances, and other interests pursuant to 11 U.S.C. §363(f) and shall be subject to higher or otherwise better offers.

24. Upon closing, the Debtor requests authority to pay the outstanding taxes due to York County and to pay to the Bank the net remaining after closing costs and commissions.

25. The Debtor has determined that it is in the Debtor's best interests and the best interests of its creditors to accept the School District's offer, subject to court approval.

## REQUEST FOR APPROVAL OF THE SALE

## 11 U.S.C. § 363(b)(1)

26.     Section 363(b) of the Code authorizes the debtor-in-possession to sell property of the estate outside the ordinary course of business after notice and a hearing.

27.     Although sales are usually proposed and conducted pursuant to a plan of reorganization, when a sound business justification exists, the court may authorize a sale pursuant to 11 U.S.C. §363(b)(1) without a confirmed plan of reorganization. *In re Taylor*, 198 B.R. 142, 156-157 (Bankr. D.S.C. 1996); see also *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re WBQ Partnership*, 189 B.R. 97 (Bankr. E.D. Va. 1995).

Under the sound business purpose test, the Debtor has the burden of proving that:

> A. sound business reason or emergency justifies a pre-confirmation sale;
> B. the sale has been proposed in good faith;
> C. adequate and reasonable notice of the sale has been provided to interested parties; and
> D. the purchase price is fair and reasonable.

*In re Taylor*, 198 B.R. at 157.

### A.     **Sound Business Reason or Emergency**

In the present case, sound business judgment warrants the sale of the Subject Property prior to confirmation of the Plan. The property has been marketed for several years. In this economic climate, potential purchases have funding challenges which make it difficult to close on sales. Many potential purchasers require seller financing. The purchaser of the LPA, however, is a government entity with appropriated funding. The purchaser is ready, willing, and able to close on the sale immediately. If this sale is lost, the School District will simply purchase property elsewhere and the sale will be lost to

7

Gold Hill for good. The School District has already extended the closing date once, and has indicated that it will not extend the date again. It is imperative that this sale be approved to close immediately in order to avoid losing the purchaser.

### B. **Good Faith**

The Debtor believes the terms and conditions of the proposed sale are fair, reasonable and appropriate and were reached after arms-length negotiations. The Debtor believes, and will further show at the hearing on this Motion, that both the Debtor and the School District are proceeding in good faith.

### C. **Notice**

All creditors have been served a copy of the Application and the notice of hearing on the Application. Based upon the foregoing, the Debtor believes that notice is adequate and reasonable. The Bank has been aware of the proposed sale for many months. The Debtor has been negotiating with the Bank for quite some time in an effort to avoid the bankruptcy and the need for this emergency hearing on the sale.

### D. **Purchase Price**

The Debtor submits to the court that the Purchase Price for the Subject Property is reasonable and fair and currently represents the highest and best recovery for the Debtor and its creditors. The property has been marketed for sale for many years, and, although the Debtor has received various inquiries and letters of intent, the current offer by the School District is the only firm offer that has been received. In a time when other potential purchasers are facing difficulties with financing, the School District is in a position to close on the purchase. Based upon the foregoing, the Debtor believes that the proposed sale is in the best interests of the estate and its creditors.

**11 U.S.C. § 363(f)**

28. Pursuant to § 363(f), such property can be sold free and clear of any interest in the property if:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

29. Only one of the five (5) conditions must be present to authorize a sale under § 363(f). *In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995). In the event that the secured creditor, the Bank, does not consent to allow the sale under § 363(f)(2), the proposed sale can be authorized under subsection (3), (4), or (5).

**The sale meets the criteria of 11 U.S.C. § 363(f)(3) because such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property.**

30. The Debtor proposes to sell the Subject Property for $2,900,000. This proposed selling price is greater than the aggregate value of all liens on such property.

31. The Subject Property is a small portion of a larger tract of property upon which the Bank has its liens (the "Bank Collateral"). The Bank Collateral can be described as follows:

9

    Parcel 1:  2.55 acres with 2 buildings

    Parcel 2:  5.29 acres graded pad ready

    Parcel 3:  95.608 acres of rough graded land

32. Parcel 1 was appraised in October 2009 at **$3,221,300**. Parcel 2 was appraised at the same time at **$1,428,700**. In June 2007, Parcel 3 was appraised at **$8,609,000**. At the Foreclosure, the Bank bid a total of **$5,193,000** for the entirety of the Bank Collateral, which includes Parcels 1, 2, and 3. The Debtor recognizes that these appraised values are stale and too high in the current economic climate, and also the Debtor recognizes that the credit bid value of the Bank is low and does not reflect the true market value. Based on the current sale offer and other current valuation factors and conditions, the Debtor has valued these parcels on the bankruptcy schedules as follows:

    Parcels 1 & 2:  $4,000,000

    Parcel 3:       $3,000,000

33. Per the Debtor's valuation, the aggregate value of the Bank Collateral is $7,000,000. The liens on the Bank Collateral include $203,000 to York County and $6,335,101 to the Bank, for a total face value of aggregate liens in the amount of $6,538,101.

34. Because the proposed sale does not include the entire Bank Collateral, it is necessary to extrapolate the value of the liens on the Subject Property. *See In re Terrace Gardens Park Partnership*, 96 B.R. 707 (Bankr. W.D. Tx. 1989) (court approved sale of one-third of debtor's real estate assets under § 363(f)(3) by analyzing square foot value and extrapolating the value to the whole).

35. In *Terrace Gardens*, the court first noted the split of authority in interpreting the language of § 363(f)(3). Subsection (f)(3) provides that the selling price of the property must be "greater than the aggregate value of all liens on such property." Some courts hold that this language means that the sale price must yield more than the total face value of all *debts* secured by the liens. *See id.* at 712 (discussing the split of authority). This view has been criticized by other courts that hold that the language should be interpreted consistent with § 506(a), such that "a sale price need only exceed the *value* of the property." *Id.* (*citing In re Beker Industries Corp.*, 63 B.R. 474 (Bankr. S.D.N.Y. 1986); *Matter of Rouse*, 54 B.R. 31 (Bankr. W.D. Mo. 1985); *In re Hatfield Homes, Inc.*, 30 B.R. 353 (Bankr. E.D. Pa. 1983); 11 U.S.C. § 506(a)); *In re Boston Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010) (value of lien for purposes of (f)(3) to be determined by reference to § 506(a)); *In re Collins*, 180 B.R. 447, 451 (Bankr. E.D. Va. 1995) (value under (f)(3) is actual secured value and not face value of lien).

36. The Fourth Circuit has not ruled on this split of authority. Under either interpretation, however, this proposed sale meets the requirement under (f)(3).

37. If the *face value of the debt* is considered, then the total debt on the Bank Collateral is $6,538,101 (York County debt and the Bank debt). The proposed sale includes only a portion of the property for $2,900,000. After the sale, York County will be paid in full, and the remaining debt to the Bank will be $3,804,101. *See Sale Notice* (proposed distribution includes full payment to York County and payment to the Bank of $2,531,000). After the sale, the Bank Collateral will consist of all of Parcel 2 and approximately 81 acres remaining of the 95 acres of Parcel 3, together valued at

$4,100,000. Because the remaining collateral, as extrapolated from the partial sale, is valued higher than the remaining debt to the Bank, it follows that the sale price of the Subject Property is greater than the aggregate value of all liens on the property.

38. This is the same result if the court interprets the language of (f)(3) consistent with § 506(a) such that the sale price must be greater than the *value of the property* that secures the liens. In this case, the Bank values the property at $5,193,000, according to its credit bid at the Foreclosure. Presumably, this credit bid includes the value of the York County lien, since the Bank would be taking the property subject to the *ad valorem* taxes that are due. The sale of the Subject Property for $2,900,000 represents over 55% of the value of the Bank Collateral. According to the appraisals, Parcel 1 represents about 25% of the total value of the Bank Collateral. Thus, a sale price representing 55% of that value exceeds the value of the property securing the liens. As a result, the requirement under (f)(3) is met.

39. In addition to meeting the requirement that the sale price be greater than the aggregate value of the liens on the property, courts have also considered certain factors to determine if the circumstances justify the sale. Factors considered include what chapter the case was filed under, whether the proposed sale involves a major or sole asset of the estate, whether the sale is a piecemeal substitution for a plan of reorganization, and overall benefit to the estate. *See In re Collins*, 180 B.R. at 451; *In re Terrace Gardens*, 96 B.R. at 713.

40. This case was filed under Chapter 11. Unlike a Chapter 7 case, where a trustee would abandon, rather than sell, fully encumbered property, a Chapter 11 debtor-in-possession "might need to sell off some of its assets to 'slim down' as part of the

12

reorganization process preliminary to a plan.'" *In re Terrace Gardens*, 96 B.R. at 713. In this case, this sale is crucial to the reorganization efforts of the Debtor. An abandonment of the encumbered property would render the Chapter 11 meaningless. "Greater flexibility should be afforded debtors in chapter 11 cases to effectuate the reorganization goals of that chapter." *Id*. at 715.

41.    The proposed sale involves only a small portion of the Debtor's acreage, and involves only 25% of the value of the Debtor's assets. Thus, the creditors will have an opportunity to be compensated from other assets of the estate.

42.    Like *Terrace Gardens*, this sale "will eliminate one secured creditor and substantially reduce the claim of another . . . . As the plan contemplates orderly liquidation in any event, taking advantage of immediate sales at favorable prices aids that process." *Id.* at 714.

43.    The overall benefit to the estate is apparent. In this challenging real estate market, the School District's ability to close on this sale, at a purchase price that exceeds any offer that could otherwise be obtained for this property, is critical to the success of the Debtor's reorganization efforts. The sale will eliminate York County as a secured creditor, and will reduce the indebtedness to the Bank by approximately 40%. The sale will also set a benchmark to establish values and use of the property for future sales.

44.    The sale price is the best price obtainable under the circumstances, is within the value placed on the property in the Debtor's schedules, and exceeds the value placed on the property by the Bank per its credit bid. While the property represents only 25% of the overall value of the Bank Collateral, the purchase prices represents 55% of

the value that the Bank placed on the Bank Collateral. Thus, this sale represents a greater return than the Bank could expect in a foreclosure sale or in any other circumstance.

45. Because the requirements of § 363(f)(3) are met, the Court should approve the sale on that basis.

**The sale meets the criteria of 11 U.S.C. § 363(f)(4) because such interest is in bona fide dispute.**

46. "Pursuant to 11 U.S.C. § 363(f)(4), the Court may authorize the Trustee to sell property under § 363(b) free and clear of any interest in such property of an entity other than the estate only if such interest is in bona fide dispute." *In re Daufuskie Island Properties, LLC*, 431 B.R. 626, 645 (Bankr. D.S.C. 2010) (*citing In re Taylor*, 198 B.R. 142, 158 (Bankr. D.S.C. 1996)). "The goal of § 363(f)(4) is to 'allow the sale of property subject to dispute so that liquidation of the estate's assets need not be delayed while such disputes are being litigated.'" *Id.* (*quoting In re Bella Vista Associates,* 2007 WL 4555891 at * 4 (Bankr. D.N.J. December 18, 2007)). *See also In re Durango Georgia Paper Co.,* 336 B.R. 594, 597 (Bankr. S.D. Ga. 2005); *In re Gulf States Steel, Inc. of Alabama,* 285 B.R. 497, 507 (Bankr. N.D. Ala. 2002). In order to sell estate assets free and clear of a party's interest pursuant to § 363(f)(4), the debtor "must demonstrate that (1) [the party] holds an 'interest' in the [e]state [a]ssets, and (2) that the interest is in bona fide dispute." *Id.* at 645-46 (*citing In re BHB Enterprises, LLC,* 1997 WL 33344250 at *4 (Bankr. D.S.C. September 30, 1997)).

47. "[U]nder § 363(f)(4), it is the Debtor's obligation to demonstrate that there exists a bona fide dispute with respect to" the interest in question. *In re Taylor*, 198 B.R. at 162. "The phrase 'bona fide dispute' is not defined in the Bankruptcy Code," but "[c]ourts applying § 363(f)(4) have developed a standard for determining whether a 'bona

14

fide dispute' exists." *Id.* The standard "is whether there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest." *Id.* "This standard does not require that the Court resolve the underlying dispute or determine the probable outcome of the dispute, but merely whether one exists." *Id.* (*citing In re Collins,* 180 B.R. 447, 452 (Bankr. E.D. Va. 1995)). *See also In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991). "Evidence must be provided to show factual grounds that there is an objective basis for the dispute." *In re Daufuskie Island Properties, LLC*, 431 B.R. at 646 (*citing In re Taylor*, 198 B.R. at 162). Section 363(f)(4) "clearly entails some sort of meritorious, existing conflict." *In re Taylor*, 198 B.R. at 162 (*citing In re Atlas Machine & Iron Works v. Bethlehem Steel,* 986 F.2d 709 (4th Cir. 1993)).

48. In the case at bar, the Bank has acted in bad faith with respect to the Debtor, and its interest is in bona fide dispute.

49. In the Fall of 2009, the Bank was aware that the Debtor was auctioning the property at an absolute auction. Despite acquiescing to the auction and indicating that there would be "no problem" in releasing the parcels that sold at auction, the Bank refused to release any parcel that sold at auction. As a result, the Debtor is currently a defendant in three (3) civil lawsuits for specific performance and damages due to the failure to close on the sales.

50. Following its refusal to release the auctioned parcels, the Bank demanded that the Jennings cross-collateralize their adjacent property with Helda's property, even though the properties had no common ownership. When the Jennings refused, the Bank foreclosed on the Helda property. Now that the Bank has title to the Helda property, which is located in the same vicinity as the Gold Hill property, the Bank wishes to bolster

15

the value of the Helda property by also acquiring the Gold Hill property. Upon information and belief, the Bank is significantly undersecured by the Helda property, and knows that it is oversucured by the Gold Hill property. Although the Bank debt would be reduced by 40% with the proposed sale to the School District and could be paid in full through future sales, the Bank would rather foreclose so that it could control the Gold Hill property, along with the Helda property, in order to secure a greater overall value for the Helda property.

51. The tactics of the Bank are improper, overreaching, and in bad faith. Moreover, the Bank has had notice of this proposed sale for many months and, at one time, agreed to the sale.

52. The bad faith actions of the Bank constitute unclean hands which bar its equitable and legal remedies. *See Wachovia Bank N.A. v. Coffey*, 698 S.E.2d 244 (S.C. Ct. App. 2010); *Matrix Financial Services Corp. v. Frazer*, 2010 WL 3219472 (S.C. Sup. Ct., Aug. 16, 2010). As a result, the interest of the Bank is in bona fide dispute. Therefore, the conditions of § 363(f)(4) are satisfied, and the proposed sale should be approved.

> **The sale meets the criteria of 11 U.S.C. §363(f)(5) because such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.**

53. The Bank could be compelled to accept a money satisfaction of its interest in the Subject Property, such that § 363(f)(5) is met.

54. Pursuant to the Foreclosure, the Bank bid $5,193,000 for the entirety of the Bank Collateral. As set forth above, the Subject Property represents 25% of the value of the entire property, or $1,298,250 of the Foreclosure credit bid.

55. Because the Bank has demanded a deficiency, the Foreclosure remains open for thirty (30) days and is subject to an upset bid. Pursuant to S.C. Code § 15-39-720, the Bank is not permitted to make another, higher, bid on the property. Instead, if any third party makes a higher bid on the property, that party will be deemed the successful purchaser, and the Bank will be compelled under § 15-39-720 to accept the money satisfaction of its interest in the property.

56. In this case, the extrapolated credit bid on the Subject Property is $1,298,250. The proposed sale would pay the Bank $2,531,000 for the Subject Property. In a foreclosure context, the Bank could be compelled pursuant to § 15-39-720 to accept $2,531,000 in satisfaction of its interest in the Subject Property. Therefore, the criteria in (f)(5) is met.

57. A Chapter 11 debtor "must be given flexibility in the difficult task of [rehabilitation] while providing adequate protection for creditors' interests." *Matter of Stroud Wholesale, Inc.*, 47 B.R. 999, 1003 (Bankr. E.D.N.C. 1985). "In order to effectively rehabilitate a debtor it may be necessary to sell certain assets free and clear of all liens and interests. In such cases, equitable considerations may dictate that creditors receive less than full satisfaction of their interests, or that such interests be secured by other collateral." *Id.*

58. "A sale, based upon the authority contained in § 363(f)(5), requires, in turn, a showing, pursuant to § 363(e) of adequate protection to the secured creditor." *In re Weyland*, 63 B.R. 854, 860 (Bankr. E.D. Wis. 1986) (*citing* House Report No. 95–595, 95th Cong., 1st Sess. 345 (1977) and Senate Report No. 95–989, 95th Cong., 2d.Sess. 56

17

(1978)). In this case, the Bank is adequately protected by its remaining collateral, the value of which exceeds the remaining debt.

59. As a result, the sale should be approved pursuant to § 363(f)(5).

### **CONCLUSION**

60. In the present case, the Purchase Price of the Subject Property exceeds the value of any and all secured claims against the Subject Property, as extrapolated from the whole. Indeed, the value of the remaining property after the sale oversecures the remaining debt to the Bank, and the other secured creditor, York County, will be satisfied in full from the sale. The provisions of § 363(f)(3) are met.

61. In addition, there is a bona fide dispute as to the interest of the Bank due to unclean hands and bad faith, which renders the Bank's interest in the property unenforceable. Therefore, the sale is authorized under § 363(f)(4).

62. Finally, because the Bank has made a credit bid on the Subject Property, which is subject to an upset bid, the Bank could be compelled under S.C. Code § 15-39-720 to accept a money satisfaction of such interest. Thus, § 363(f)(5) is met, and the sale could be authorized under that provision.

63. Federal Rule of Bankruptcy Procedure 6004(g) provides that an order authorizing the use, sale or lease of property will be stayed for ten (10) days after entry of the approved order unless the Court orders otherwise. Because of the Debtor's need to move promptly in order to close on this sale, the Debtor requests that the proposed sale be approved and that the Court waive the ten (10) day stay of Federal Rule of Bankruptcy Procedure 6004(g).

WHEREFORE, the Debtor respectfully requests that the Court approve the sale of the Subject Property to the School District pursuant to the terms and conditions of the attached LPA, waive the ten (10) day stay of Federal Rule of Bankruptcy Procedure 6004(g), and grant such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED on this the 16th day of April, 2011, at Columbia, South Carolina.

        BARTON LAW FIRM, P.A.

    BY: /s/Christine E. Brimm\_\_\_\_\_
      Barbara George Barton, #1221
      Christine E. Brimm
      Attorney for the Debtor
      1715 Pickens Street (29201)
      P. O. Box 12046
      Columbia, South Carolina 29211-2046
      Tele: (803) 256-6582
      Fax: (803) 779-0267