## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| Gold Hill Enterprises, LLC, | ) | Case No. 11-02458-hb |
| | ) | |
| _____ Debtor. ___) | | |

### NOTICE AND APPLICATION FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS

**TO:    All Creditors and Parties in Interest**

YOU ARE HEREBY NOTIFIED that Gold Hill Enterprises, LLC, the debtor-in-possession ("Debtor") in the above captioned matter, is applying for approval, pursuant to 11 U.S.C. §§ 363(b)(1) and (f), Rule 6004 of the Federal Rules of Bankruptcy Procedure, and SCLBR 6004-1, to sell the property of the Debtor's estate as described below, free and clear of all liens and encumbrances according to the terms and conditions stated herein below.

TAKE FURTHER NOTICE that any response, return and/or objection to this Notice and Application should be filed with the Clerk of Bankruptcy Court no later than twenty-one (21) days from service of this Notice and a copy simultaneously served on all parties in interest.

TAKE FURTHER NOTICE that a hearing will be held on the proposed sale in this Notice on September 8, 2011 at 1:30 p.m., **at the Donald Stuart Russell Federal Courthouse, 201 Magnolia Street, Spartanburg, SC 29306.**

TYPE OF SALE:  Private

PROPERTY TO BE SOLD:  As more fully described on the Agreement For Sale and Purchase of Developed Land (the "Purchase Agreement"), attached hereto as **Exhibit A**, the property consists of twenty (20) acres, plus or minus, contained within the "Retail/Office" tract of 14.74 Acres and the "Mixed Use/Multifamily" tract of 13.75 Acres, and a portion of the "Open Space" tract of 21.40 Acres.  The precise acreage, including the precise portion of Open Space, to be conveyed will be surveyed within the due diligence period and incorporated into the Purchase Agreement as set forth therein.

PRICE:  $95,000 per acre, excluding the "Open Space", for a total of $1,900,000.00 (plus or minus).

APPRAISAL VALUE:  The Debtor is informed and believes that the purchase price represents a greater value than could be obtained elsewhere.

BUYER:  Agape Senior, LLC, a South Carolina limited liability company, 1053 Center Street, West Columbia, SC 29169.  Attn:  Rev. Scott Middleton, CEO.

PLACE AND TIME OF SALE:  The proposed sale includes seller financing, such that the First Closing will occur on or before September 30, 2011, upon authorization by the Court, and the Second Closing will occur on or before one (1) year after the First Closing. The property will transfer upon the First Closing with a minimum down payment of 15% of the Purchase Price, with the balance of the Purchase Price, plus interest accruing at 7% per annum, to be paid at the Second Closing.

SALES AGENT:  Palmetto Group Consulting, LLC, 1171 Market Street Suite 204, Fort Mill, SC 29708.  *This is the Buyer's consultant.

COMPENSATION TO SALES AGENT:  Compensation to Buyer's consultant is per agreement with Buyer, to be paid by Buyer.

ESTIMATED TRUSTEE'S COMPENSATION:  Not applicable.

LIENS/MORTGAGES/SECURITY    INTERESTS    ENCUMBERING    PROPERTY: Synovus Bank ("Synovus") claims a first mortgage on the property in the amount of approximately $3,672,660.  This mortgage is secured by additional property that is not included in this sale.

Note:  The amount listed above should not be construed as an acknowledgement or stipulation by the Debtor as to the validity, priority or amount due to the listed secured creditor.

DEBTORS' EXEMPTIONS:  Not Applicable.

PROCEEDS ESTIMATED TO BE PAID TO THE ESTATE:  The proposed distribution of sale proceeds is as follows (based on estimated closing costs):

| | |
|---|---|
| First Closing Proceeds: | $285,000 |
| Estimated Closing Costs[1] | $ 65,000 |
| Payment to Synovus (per Plan) | $165,000 |
| Remaining Amount to Estate: | $55,000 |

---

[1]Closing Costs include UST fees of $1950, prorated taxes, legal fees related to closing including preparation and recording of loan and mortgage documents necessary for seller financing, documentary stamps, and other customary closing costs.

| Second Closing Proceeds: | $1,728,050[2] |
|---|---|
| Estimated Closing Costs[3] | $ 20,000 |
| Payment to Synovus (per Plan)[4] | $1,281,037.50 |
| Remaining Amount to Estate: | $427,012.50 |

The benefit to the Estate will be an approximate 40% reduction in the outstanding principal due to Synovus upon the Second Closing, while the estate maintains additional acreage from which to satisfy the remaining amount due to Synovus in full as set forth in the Plan filed by the Debtor on July 12, 2011.  The sale proceeds will also be used to fund other obligations per the Plan.  In addition, it is anticipated that this sale will create activity which will entice further interest in the surrounding property.

STAY OF ORDER:  Rule 6004(h) imposes a 10-day stay of the effectiveness of the order authorizing the sale, unless the Court orders otherwise.  The Debtor requests that the Court order that the 10-day stay shall not apply to this sale order.

The Debtor is informed and believes that it would be in the best interests of the Debtor's estate to sell said property by private sale. Applicant also believes that the funds to be recovered from the sale of said property justify its sale and the filing of this application.

The Court may consider additional offers at any hearing held on this notice and application.  The Court may order at any hearing that the property be sold to another party on equivalent or more favorable terms.

The Trustee may seek appropriate sanctions or other similar relief against any party filing a spurious objection to this notice and application.

WHEREFORE, the Trustee requests the Court issue an order authorizing sale of said property and such other and further relief as may be proper.

---

[2] Based on 7% per annum accruing for one (1) year.  The amount of interest due, and thus the final amount due to at the Second Closing, is dependent upon the actual date of the Second Closing.

[3] Closing Costs include UST fees of $6500, legal fees related to closing including satisfaction of mortgage related to seller financing, and other customary closing costs.

[4] The amount due to Synovus per the Plan may differ if the Synovus debt has been reduced or eliminated by other Plan payments at the time of the Second Closing.

BARTON LAW FIRM, P.A.


BY:   /s/Christine E. Brimm
      Barbara George Barton, #1221
      Christine E. Brimm, #6313
      Attorney for the Trustee
      1715 Pickens Street (29201)
      P. O. Box 12046
      Columbia, South Carolina 29211-2046
      Tele: (803) 256-6582
      Fax: (803) 779-0267

# **<u>EXHIBIT A</u>**

## <u>AGREEMENT FOR SALE AND PURCHASE OF DEVELOPED LAND</u>

**THIS AGREEMENT FOR SALE AND PURCHASE OF DEVELOPED LAND** (this "Agreement") is made and entered into as of the Effective Date (defined in Section 29) by and between **GOLD HILL ENTERPRISES, LLC, A SOUTH CAROLINA LIMITED LIABILITY COMPANY**("Seller"), and **AGAPE SENIOR, LLC**, a South Carolina limited liability company ("Buyer").

### RECITALS:

A.      Seller developed a certain Tract of Land known generally as the Gold Hill Enterprises, LLC Tract which property is located off of Gold Hill Parkway in York County and is generally referenced and detailed as being a "Retail/Office" tract of 14.74 Acres, a "Mixed Use/Multifamily" tract of 13.75 Acres and an "Open Space" tract of 21.40 acres of land detailed in Exhibit "A" which is attached hereto.

B.      Buyer desires to purchase an approximately Twenty Acre (plus or minus) portion specifically within the "Retail/Office" tract of 14.74 Acres and within the "Mixed Use/Multifamily" tract of 13.75 acres detailed above. The Twenty Acre (plus or minus) portion will be deliniated as part of the "Due Diligence" allowed pursuant to the terms of this Agreement (the "Land") with the additional understanding that as part and parcel to the Twenty Acres to be purchased, the Seller will also convey, at no charge, a portion of the "Open Space" tract of 21.40 acres of land, also to be delineated during the due diligence period. The "Open Space" to be conveyed shall include "road frontage" along Springfield Parkway upon which "signage" for Buyer will be placed, which "road frontage" abuts the 14.74 Acre "Retail/Office" Tract and such additional "Open Space" acreage wherein the Seller has currently developed and put into place "stormwater retention basins" of sufficient size and quantity such that with the inclusion of said "Open Space" area the Buyer shall secure such "Open Space" area such that Buyer shall not have to construct any further stormwater retention basins on the Twenty Acre portion of property which is to be surveyed as detailed herein.

C.      Seller has agreed to finance, for a period of one year, the Land to be purchased by the Buyer ("Seller Financing") pursuant to the terms of this Agreement such that there are two contemplated "Closing" transactions to occur. The First Closing will consummate the Seller Financing of the Land by the Seller to the Buyer, and  the Second Closing will consummate the Buyer's construction loan on the Land, at which time any accrued Principal and Interest then owing by and through the Seller Financing will be paid  in full by Buyer to Seller. The Seller's Note and Mortgage will be satisfied at the Second Closing.

D.      On April 14, 2011, Seller filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the District of South Carolina, Case No. 11-01458-hb.   All agreements contained herein are subject to and contingent upon approval by the Court.

**FOR AND IN CONSIDERATION** of One and No/100 Dollars ($1.00), the mutual agreements herein contained and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged by Seller and Buyer, Seller and Buyer hereby covenant and agree as follows:

1.    **Recitals**.    The recitals set forth above are true and correct and they are incorporated herein by this reference.

2.    **Agreements to Buy and Sell**.    Subject to the approval of the United States Bankruptcy Court for the District of South Caroilna, Seller agrees to sell, and convey the Land to Buyer and Buyer agrees to purchase the Land from Seller upon the terms and conditions set forth in this Agreement.

3.    **Deposit/Purchase Price**.

(a)    Within ten (10) Business Days of the Effective Date, Buyer shall deposit $25,000.00 (the "Deposit") with Escrow Agent as Earnest Money for the purchase of the Land. Escrow Agent shall hold the Deposit in escrow and disburse or apply it pursuant to the terms of this Agreement.

(b)    Purchase price is expected to be $1,900,000.00 (plus or minus) as the price is set at exactly $95,000.00 per acre of Land purchased.

4.    **Title and Survey Matters**.

(a)    Marketability. Seller agrees that the Land to be sold pursuant to this agreement shall be marketable and insurable for title insurance purposes.

(b)    Surveys.    Seller has delivered to Buyer copies of Seller's existing survey of the Gold Hill Enterprises, LLC Tract (the "Existing Survey"). During the Due Diligence period specified within this Agreement, Buyer, at Buyer's expense, will cause the Existing Survey to be updated such that the twenty acres+/- of Land that is being purchased under this Agreement, plus all "Open Space" to be conveyed, shall be fully delineated and which survey and description of said acreage shall then be attached to and become part of this Agreement as Exhibit "B".

(c)    Defects. Buyer shall have a period of thirty (30) days from the Effective Date to obtain a commitment for title insurance ("Title Commitment"), and to review the condition of title to the Land. If Buyer provides Seller with written objections to title within the foregoing ten (10) day title review period (which title objections shall be accompanied by a copy of the Title Commitment and the underlying title exception document(s) to which Buyer objects), Seller shall have a period of thirty (30) days from its receipt of Buyer's written title objection, or within such longer period that may be agreed to in writing by Buyer and Seller, to attempt to cure Buyer's title objections and the First Closing shall be delayed as reasonably necessary to allow time for the defect to be cured by Seller. If Seller is unable or unwilling to cure any defect to the satisfaction of the Title Company and Buyer within said period, Seller shall notify Buyer, in writing, of any defect that Seller is unable or unwilling to cure and, following receipt of such notice from Seller, Buyer shall have the option either to (i) waive the uncured defect in writing and proceed with this transaction without reduction of the Purchase Price; (ii) terminate this

Agreement in writing and receive a refund of the Deposit, whereupon Escrow Agent shall return the Deposit to Buyer and the parties shall be relieved of all further liability under this Agreement; or (iii) exclude from this Agreement, in writing, the Land affected by the uncured defect and proceed with this Agreement as to the remainder of the Land. If Buyer does not provide Seller with a written title objection within the foregoing thirty (30) day title review period, Buyer shall be deemed satisfied with the condition of title to the Land. Any matters identified in the Title Commitment which are not objected to by Buyer or which are waived by Buyer shall be deemed Permitted Encumbrances to title.

(d)    Title Policies. Buyer may, at its cost, cause the Title Company to issue an owner's title insurance policy (individually called "Title Policy" and collectively called "Title Policies") in accordance with Buyer's requirements, provided that the issuance of any endorsements to the title policy shall not be a condition to any Closing.

5.    **Conditions Precedent**.

(a)    Court Order. The sale is contingent upon the entry of an order by the Bankruptcy Court approving the sale pursuant to 11 U.S.C. §363(b).

(b)    Inspection and Due Diligence Contingency.

(i)    Inspection. Buyer shall have until the end of the "Due Diligence Period" which period of time is contemplated to be the shorter of Sixty (60) days from the "Effective Date" of this contract or September 15th, 2011 to review all matters deemed relevant by Buyer with respect to the Buyer's intended use of the Land and to determine, in Buyer's sole discretion, whether or not it will be suitable to Buyer.

(ii)    Entry. Buyer and Buyer's agents, architects, engineers, surveyors and other consultants (collectively, "Inspectors") may continue to enter upon the Land, at any time while this Agreement remains in effect, to conduct such investigations, surveys, studies, tests and analyses (collectively, "Inspections") as Buyer may deem necessary or appropriate. When such Inspections have been completed, Buyer will restore the Land to substantially the same condition as existed before such entry. Buyer agrees to hold harmless, defend and indemnify Seller from and against all loss, liability, unpaid bills, costs and expenses including reasonable attorney fees, arising out of entry upon the Land by Buyer, its agents, employees, or contractors. Upon any termination of this Agreement, Buyer shall provide Seller with copies of all third-party prepared test reports pertaining to physical testing or survey of the Land. Buyer's obligations under this subsection shall survive the Closings or the earlier termination of this Agreement.

(iii)    Development Information. Buyer acknowledges that as of the Effective Date of this Agreement, that it is in receipt of the following: (i) three (3) copies of the recorded plat; (ii) three (3) sets of any "As Built" construction drawings showing water, sewer, storm drainage, and paving plans verified by a registered professional engineer that any and all improvements to the Land and/or which were constructed adjacent to the Land for the purpose of servicing the Land, were built according to the approved engineering and construction plans submitted to the appropriate governmental entity which would have provided the construction permits for said construction (collectively, the "Approved Plans"); (iii) three (3) sets of the plans

for the underground electrical distribution system; (v) a zoning verification letter or other evidence from the applicable authority for the Land indicating the Land are approved for commercial construction consistent with the contemplated usage of the Land by the Buyer along with concurrency requirements and any applicable comprehensive plan related to same; (iv) a copy of any soils tests covering the Land, including geotechnical reports, plasticity index tests, density tests and such other investigation which may have been undertaken by Seller with respect to the Land; (v) a copy of a Phase I environmental audit if same has ever been undertaken on any part of the Land; and (vi) copies of any and all permits, licenses, approvals, orders, notices, consents, certificates, agreements, appraisals, surveys, reports, tests, studies and other plans and specifications related to the Land, which are in Seller's possession. In conjunction with the above listed information, if Seller receives any additional information pertaining to the development of the Land while this Agreement remains in effect, Seller shall deliver copies of such additional information to Buyer within three (3) days of Seller's receipt. All of the foregoing information is collectively referred to as the "Development Information" in this Agreement. If this Agreement is terminated prior to the First Closing, Buyer shall return the Development Information to Seller upon the termination of this Agreement.

(c)     Seller Performance. Buyer's obligation to purchase the Land from Seller in accordance with this Agreement is contingent upon the timely performance by Seller of all of Seller's obligations under this Agreement and the continued accuracy and fulfillment, through and including the date of each Closing, of all of Seller's representations and warranties under this Agreement, including, without limitation, those set forth in Sections 12 and 15 below, failing which, Buyer shall have the remedies for Seller default set forth in Section 19.

6.     **Closings & Financing Terms**. "Closing" means each act of settlement of the purchased Land pursuant to this Agreement for which this Agreement contemplates two Closings to occur. Buyer shall purchase the Land from Seller at the First Closing wherein Buyer shall pay to Seller, in immediately available funds, 15% of the purchase price, and the Seller shall "Seller Finance" the remaining portion of the purchase price. Buyer shall pay off any accrued Principal and Interest under the terms of the Seller Financing at the Second Closing wherein the Buyer is contemplated to have secured a construction loan wherein the first draw from same would be the payoff of the Seller Financing undertaken in the First Closing.

The Closings shall occur as follows:

(a)     First Closing: The First Closing shall occur on or before the shorter of Sixty (75) days after the Effective Date of this Agreement or September 30, 2011.

(b)     Second Closing:  The Second Closing shall occur on or before one year (365 Days) after the First Closing.

(c)     Defective Land.

(i)     At any time prior to the Second Closing hereunder, Buyer shall have the option of engaging its geotechnical engineer to investigate the suitability of the soil conditions on the Land. If in the course of any such investigation Buyer's geotechnical engineer reasonably determines that the soil conditions of the Land do not reach an allowable bearing pressure of 2500 psf and, as such, is not suitable for the construction contemplated by the Buyer

without remediation.  If the anticipated cost of remediation is in excess of $25,00.00 ("Defective Land"), Buyer shall deliver a copy of the geotechnical engineer's report (a "Geotech Report") to Seller within ten (10) business days after Buyer's receipt of such Geotech Report. Each Geotech Report shall provide an estimation of the cost to remediate the soil conditions on the applicable Defective Lot(s).

(ii)    Within ten (10) business days after Seller's receipt of a Geotech Report on the Land, Seller shall, in Seller's sole discretion, with respect to the Defective Land referenced in such Geotech Report, deliver written notice to Buyer of its election to either (1) decline to share in the cost of remediation or otherwise act to cure the defective soil conditions or (2) pay the cost to remediate the defective soil conditions to the extent the cost of such remediation exceeds $25,000.00 as outlined in the Geotech Report.  If Seller elects its option in clause (2) above, then Buyer shall proceed to either Closing on the applicable Defective Land per the terms of this Agreement and shall receive either a credit against the Purchase Price in the actual amount of Seller's remediation obligation at the First Closing or a credit against the applicable Principal and Interest payment required to pay off Seller at the Second Closing. If Seller elects its option in clause (1) above, then Buyer, in Buyer's sole discretion, shall, within five (5) days after the date of Seller's notice, deliver written notice to Seller of its election to either (a) proceed to Closing on the Defective Land per the terms of this Agreement without any adjustments to the Purchase Price or (b) terminate its obligation to purchase the Defective Land.

(iii)    Seller shall reserve the option to dispute Buyer's Geotech Report and deliver written notice of the dispute within ten (10) business days after Seller's receipt of Buyer's Geotech Report.  If Seller choses this option, Seller shall cause a report to be prepared with respect to Defective Land, by a separate geotechnical engineering firm (a "3rd Party Geotech Report").  Buyer and Seller shall mutually agree upon the separate geotechnical engineering firm used.  The 3rd Party Geotech Report  shall be binding on the parties and a Defective Lot shall require the notices/remedies provided in sections (ii) and (iii) above.

(d)    Location.  The Closings shall take place in escrow at the location designated by Buyer.

(e)    Seller Financing Terms.  At the First Closing, the Seller shall provide Seller Financing to the Buyer under the following terms and conditions:

(i)    Buyer shall provide a minimum down payment to Seller of Fifteen (15%) of the Purchase Price, which down payment may be used by the Seller to pay Seller closing costs (including applicable property taxes, legal fees, consulting fees, etc.) and may also be used to secure a release of the Land from any liens or encumbrances other than a mortgage held by the Seller.

(ii)    Seller shall "Seller Finance" the balance of the purchase (85%) to Buyer for the period of one year from the date of the First Closing at the rate of seven percent (7%) per annum and which interest shall accrue and be paid in one lump sum payment of Principal and Interest at the Second Closing as detailed above.

(iii)    The Seller financing in question shall be further detailed in "Commercial Standard Loan Documents" which are to be prepared by the Seller and approved by the Buyer during the Due Dilligence period detailed herein. The Loan Documents shall be "non-recourse" as to any individual person or person(s) associated with the Buyer (or in this case the buying legal entity) and shall further carry recourse as to the Buyer only as detailed in the aforementioned mutually agreed to "Commercial Standard Loan Documents". The Commercial Standard Loan Documents shall include a mortgage to the Seller with provisions for foreclosure in the event Buyer does not or cannot timely consummate the Second Closing, or if Buyer otherwise defaults under this Agreement or the Commercial Standard Loan Documents.

7.    **Expenses**. Seller shall pay for state documentary stamps required to be affixed to the deed as part of the First Closing; the cost to prepare and record any instrument required to cure any title defect as well as all loan and mortgage documents necessary to effectuate the Seller Financing of the Land to Buyer and any other expense agreed to be paid by Seller. Buyer shall pay the cost to record the deed, the premiums for any title insurance obtained by Buyer, the cost of the Updated Survey, and any other expense agreed to be paid by Buyer. Except as provided in Section 20, each party shall bear its own attorney, paralegal and consultant fees and disbursements in connection with this Agreement and each Closing.

8.    **Taxes**. Ad valorem taxes for the year of Closing shall be prorated at the First Closing only based upon the applicable tax obligation for the Land being purchased. If the Closing occurs before the millage rate is fixed for the applicable year, the proration of taxes shall be based upon the millage rate for the preceding year applied to the latest available assessed valuation. Any certified, confirmed, and ratified special assessment liens as of the First Closing are to be paid by Seller. Following the First Closing, all subsequent property tax liability shall become the sole responsibility of the Buyer.

9.    **Closing Documents**. The following documents, in form and content acceptable to Buyer, shall be executed and delivered at each Closing:

(a)    Warranty Deed. Seller shall deliver a general warranty deed for the applicable Land, subject only to the lien of taxes not yet due and payable, Seller's mortgage as a result of the Seller Financing, easements and building and use restrictions of record, governmental ordinances and regulations affecting the Land and the Permitted Encumbrances.

(b)    Assignment. Seller shall deliver to Buyer an assignment of all rights and interests benefiting or pertaining to the Land then being conveyed, including but not limited to all of the following to the extent they exist: (i) improvements, timber and vegetation located on the Land, (ii) easements serving the Land, and (iii) rights in and to alleys or rights-of-way adjacent to the Land if applicable.

(c)    Affidavits. Seller shall deliver the Non-Foreign Affidavit required by Section 23.

(d)    Closing Statement. Each party shall deliver a closing statement.

(e)    Seller Financing Loan Documents. For the First Closing, Seller shall provide, and Buyer shall execute, all Loan Documents necessary to effectuate the Seller Financing contemplated herein, including but not limited to a Promissory Note and Mortgage.

(f)    Other Documents. Each party shall deliver such other documents as may be required by this Agreement or are reasonably requested by either party or the Title Company.

10.    **Possession**. Seller shall deliver exclusive possession of the Land on the date of the First Closing. Buyer shall not commence any construction activities, alter, or deposit any spoils or debris on the Land prior to taking possession of the property as contemplated herein.

11.    **Line Item Left Blank Intentionally.**

12.    **Development and Construction Requirements**. Seller represents warrants and covenants to Buyer that to the best of Seller's knowledge, Seller has developed the Land in accordance with the following (collectively, the "Development Requirements"):

(a)    To the best of sellers knowledge, all development work has been finally completed by the Seller in accordance with any plans provided to any applicable State or Local governing body;

(b)    To the best of sellers knowledge, the Land is suitable for commercial construction, is free of muck or other organic debris, rock, trash or other subsurface material which would not support a typical commercial foundation at a reasonable cost;

(c)    To the best of seller's knowledge, no part of the Land within fifty feet (50') of the perimeter of any reasonably contemplated building pad area lies within the Army Corps of Engineers 100-year flood plain. In the event Seller has filled areas previously located within such flood plain, Seller shall have obtained flood map revisions from the Federal Emergency Management Administration prior to completion;

(d)    To the best of sellers knowledge, all utilities are properly installed in road right-of-way or utility easements adjacent to the Land, with operable water and sanitary sewer taps either installed or capable of installation in sufficient size and with sufficient capacity available for the commercial construction contemplated by Buyer, such that the Land is suitable and ready for beginning of the building permit from the City, County and/or any other required governmental authority, including without limitation, (a) a sanitary sewer collection system, which shall include installation of a sewer connection NS extension (sewer lateral) to the boundary of the Land in accordance with the specifications and standards required by the governmental authority having jurisdiction over said matters and that such sanitary sewer collection system and the Land grading shall be designed to provide for a gravity flow sewage connection from any contemplated building pad area to the a sewer lateral; (b) a public or private water source and distribution system has been installed up to the boundary of the Land which meets all qualifications of the authority having jurisdiction over said matters; (c) a storm drainage system has been installed or is capable of being installed without generating substantial "wastage" of the Land to be purchased by the Buyer for such non-building pad usage as storm water retention or the like as required by the local governmental or other authority that is over

said matters; and (e) permanent underground electrical service has been provided to the border of the Land which service is sufficient to provide for the contemplated commercial use of the Buyer.

(e)     To the best of seller's knowledge paved streets have been installed and accepted which provide access to the Land as required by the appropriate governmental authority. Seller has provided any required bonds with such authority if necessary to cover maintenance of the paving and other roadway improvements.

13.     **Moratorium**. If any judicial decree is entered, governmental order is issued or moratorium is imposed prior to any Closing that would impair or delay Buyer's improvement or use of the Land for the construction of the Commercial application contemplated by the Buyer, Buyer may at its option elect either to (a) extend the deadline for the applicable Closing until such time as the decree, order or moratorium is canceled or lifted; provided, however, Buyer shall not extend any Closing beyond six (6) months from the original deadline for that Closing, or (b) terminate this Agreement, whereupon Escrow Agent shall return the Deposit (if applicable) to Buyer and the parties shall be relieved of all further liability under this Agreement with respect to the Land upon conveyance of the Land back to the Seller if same is applicable. Seller represents that to its knowledge there is no such decree, order or moratorium pending or threatened as to the Land and that Seller has no knowledge that any such action is presently contemplated.

14.     **Condemnation**. If any condemnation or similar action is instituted or threatened against any portion of the Land prior to either Closing, Buyer may, at its option, do one of the following: (a) delete from this Agreement the Land taken or threatened to be taken and be relieved from the obligation to pay the purchase price assigned to the Land by this Agreement; or (b) if more than twenty percent (20%) of the Land in question is affected or potential affected, terminate this Agreement and, as applicable, receive a refund of the Deposit, whereupon Escrow Agent shall deliver the Deposit to Buyer and the parties shall be relieved of all further liability under this Agreement upon conveyance of the Land back to Seller if same is applicable. Immediately upon learning of such pending or threatened action, Seller shall notify Buyer and vice versa. Seller represents that to its knowledge there is no condemnation or similar action pending or threatened as to the Land and that Seller has no knowledge that any such action is presently contemplated.

15.     **Seller Assurances**.

(a)     Seller represents and warrants to Buyer as of Effective Date and as of each Closing that: (i) Seller alone holds fee simple title to the Land; (ii) no person or entity other than Seller is in possession of any portion of the Land, whether as lessee, tenant at sufferance, trespasser or otherwise (iii) no lease or other tenancy is in force with respect to the Land; (iv) there exists dedicated access to the Land sufficient for the commercial construction and occupancy contemplated by the Buyer; (v) Seller has received no written notice that the Land is in violation of any governmental regulation, private restriction or any of the permits, approvals and entitlements currently in effect for the Land; (vi) Seller has received no notice of any judicial or administrative action or any action by adjacent landowners that would prevent, limit or impede Buyer's use of the Land; (vii) no other person or entity other than Buyer has any right or option to acquire any of the Land or any interest therein; (viii) as of the effective date no

assessment for public improvements has been made, nor has Seller received any written notice of planned or contemplated assessments, against the Land; (ix) Seller has no knowledge that any commitment has been made to any governmental authority, utility company, school board, church or other religious body, homeowners' association or any other organization, group or individual relating to the Land which would impose an obligation on Buyer to make any contributions or dedications of money or land or to construct, install or maintain any improvements of a public or private nature on or off the Land; (x) Seller has no knowledge that any governmental authority has imposed any requirement that would bind Buyer to pay directly or indirectly any special fees or contributions, or incur any expenses or obligations in connection with the improvement of any of the Land, except for customary building permit, impact and inspection fees, if any; (xi) none of the following conditions exist on or under any portion of the Land: muck, human burials, archaeological sites, landfills, hazardous wastes, fault lines, sinkholes or other geological conditions adverse for residential construction purposes; (xii) as of the Effective Date, the Land does not contain any specie of plant or animal that is protected or whose habitat is protected under applicable law that will delay, impede or increase the normal cost of Buyer's construction on the Land; (xiii) Seller is a limited liability company duly organized and existing in good standing under the laws of South Carolina; (xiv) Seller has full power and authority to enter into this Agreement and to comply with the terms of this Agreement, subject to approval by the United States Bankruptcy Court for the District of South Carolina; (xv) all requisite action has been taken to make this Agreement valid and binding on Seller in accordance with its terms; and (xvi) the person signing this Agreement on behalf of Seller is fully authorized to do so.

(b)     Until the First Closing on the Land, Seller shall comply with all governmental regulations applicable to the Land owned by Seller and Seller will not enter into any agreements affecting the Land without Buyer's prior written consent. Seller shall disclose promptly to Buyer in writing any condition or event arising or occurring after the Effective Date that becomes known to Seller and that contradicts in any material respect any representation or warranty of Seller set forth herein or otherwise materially affects any of the Land .

(c)     Seller agrees to join in the execution and submission of such instruments, petitions, applications, requests, and other such documents which Buyer may reasonably request in connection with Buyer's contemplated commercial construction upon the Land.

(d)     Seller agrees to maintain the Land as same is currently owned by Seller. Seller shall not allow an accumulation of trash on its Land.

(e)     Seller agrees, if Buyer were to choose to do so, to allow Buyer to place marketing signs (designating future construction/expansion plans of the Buyer) on designated portions of the Land prior to the First Closing as well as other portions of Seller's Land not purchased by Buyer (at Seller's sole discretion) if said marketing signs are deemed by Buyer to be of benefit to same. Such signs would be placed in accordance with all applicable laws, rules and regulations and only upon the prior written approval of Seller as to location, size and content of the signs.

16.     **Buyer Assurances**.

(a)      Buyer represents and warrants to Seller, as of the Effective Date of this Agreement and as of each Closing, that: (a) Buyer is a Limited Liability Company duly organized and existing in good standing under the laws of South Carolina; (b) Buyer has full power and authority to enter into this Agreement and to comply with the terms of this Agreement; and (c) the parties signing this Agreement on behalf of Buyer are fully authorized to do so.

(b)      Once the First Closing has occurred, Buyer agrees to maintain Land owned by Buyer in the condition it was purchased. When and if required, Buyer shall be responsible for the installation and maintenance of all soil erosion and sedimentation control facilities that are applicable governmental regulations and permits and approvals issued by all applicable governmental authorities again if same were to be required at some point prior to the Second Closing on the Land.

(c)      Buyer shall indemnify, defend and hold harmless Seller from and against any and all liability, loss, claims, damages, costs or expenses, including reasonable attorney fees, caused by the acts or omissions of Buyer, its agents, employees, Agreementors, subAgreementors or suppliers, including without limitation any mechanics liens filed by any of the foregoing Agreementors, subAgreementors, suppliers or laborers in connection with any of Buyer's construction type activities undertaken between the time of the First Closing and the Second Closing.

(d)      At such point as Buyer commences construction, and as a continuing obligation post First and Second Closing, Buyer shall be responsible, at Buyer's sole cost, for the removal of mud, dirt and debris, caused by Buyer's construction activities from all streets owned or adjoining such portions of the Seller's Land which is not sold to Buyer; provided, however, that Seller shall likewise be responsible for the removal of any mud, dirt or debris upon the aforementioned streets which are caused by the activities of Seller or its Agreementors.

(g)      Buyer shall immediately restore or repair damage to any improvements within Seller's Land which is not sold to Buyer which is caused by any construction or other activity of Buyer, its agents, employees, Agreementors, subAgreementors or suppliers, including any physical damage done to utilities and sedimentation controls caused by the activities of Buyer, its agents, employees, Agreementors, subAgreementors or suppliers. Seller shall provide Buyer with written notice which identifies the damage which Seller believes to be Buyer's responsibility under this Section. Within five (5) days of Buyer's receipt of such notice, Buyer shall examine such specified problem and if Buyer fails to inspect such specified problem within such five (5) day period, Buyer shall be deemed to waive its right to dispute Seller's claim. If Buyer disputes Seller's conclusion regarding the claimed problem, an engineer which is mutually acceptable to the parties shall inspect the specified problem and issue a report describing the problem and identifying the cause of the problem. The report shall be binding on the parties. The Buyer shall be responsible for the cost of the report, unless the engineer determines that no problem exists or that Buyer was not the cause of such problem, in which event Seller shall be responsible for the cost of the report. If Buyer does not dispute Seller's claim or if the engineer's report supports Seller's claim, whichever is applicable, Buyer shall repair or pay Seller the cost to repair the damage which was the subject of Seller's claim within fifteen (15) days from Buyer's receipt of Seller's written notice or the time period for repairing such damage which was specified in any notice of violation issued by any governmental agency having jurisdiction over

the Land. If Buyer fails to repair any damage within the foregoing time period, Seller shall have the right to repair the damage and Buyer shall reimburse Seller for the costs incurred by Seller within ten (10) days from Buyer's receipt of Seller's written request for reimbursement, which includes a statement identifying the costs incurred by Seller.

17.      **Contamination**. Seller has not utilized the Land, nor authorized another, to treat, deposit, store, dispose of, or place any hazardous or harmful substance, as defined by applicable law; and except as may be disclosed in any environmental reports provided by Seller to Buyer, to the actual knowledge of Seller without duty of inquiry, no other person or entity has treated, deposited, stored, disposed of or placed any hazardous or harmful substance on any part of the Land or on any land lying within a one half mile radius of the Land. If a release or threatened release of a hazardous or harmful substance has occurred on the Land prior to any Closing without fault of Buyer, which subjects Buyer to actual or potential liability or claims under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. Section 9607, or under any other statutory or common law, and Seller's representations set forth in the first sentence of this paragraph are false, Seller agrees to indemnify, hold harmless and defend Buyer from and against any such liability or claims. If at any time between the Effective Date of this Agreement and any Closing (a) any hazardous or toxic substance is placed on the Land by anyone other than Buyer or Buyer's agents, consultants, Agreementors or other invitees, or (b) Buyer discovers that Seller has breached the representation and warranty set forth in this paragraph, then, in addition to any other remedies Buyer may have, Buyer may terminate this Agreement, in which event the Deposit shall be refunded to Buyer and the parties shall be automatically relieved of all further obligations under this Agreement.

RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. ADDITIONAL INFORMATION REGARDING RADON AND RADON TESTING MAY BE OBTAINED FROM THE PUBLIC HEALTH UNIT OF THE COUNTY WHERE THE PROPERTY IS LOCATED.

18.      **Risk of Loss**. Seller shall bear the risk of loss until the time of the First Closing after which time the Buyer shall assume the risk of loss thereafter.

19.      **Default**.

(a)      By Buyer – As to the First Closing. If Buyer fails to perform timely per this Agreement prior to the First Closing as defined herein, and such failure continues thirty (30) days after receipt of written notice thereof from Seller, Seller may declare Buyer in default. In the event of such default by Buyer, and subject to the terms of the following paragraph, the Deposit shall be paid to Seller as liquidated and agreed upon damages, consideration for the execution of this Agreement and in full settlement of all claims of Seller, whereupon the parties shall be relieved of all obligations under this Agreement, with the exception of Buyer's indemnity and restoration obligations and any applicable Buyer's post-closing obligations, which survive the Agreement. Subject to the foregoing, termination of this Agreement and receipt of the Deposit shall be Seller's sole and exclusive remedy in the event of Buyer's default and Seller waives all other remedies, including but not limited to, suit for specific performance or damages.

(b)     By Buyer – As to the Second Closing. If Buyer fails to perform timely any matter in this Agreement or in the Commercial Standard Loan Documents, at any time after the First Closing, , and such failure continues thirty days after receipt of written notice thereof, Seller may declare Buyer in default. In the event of such default by Buyer, and subject to the terms of the following paragraph, Seller shall have the right to "accelerate" the terms of the Loan under which the Seller is Seller financing the Land to the Buyer such that said Loan will become immediately due and payable. Once the balance of the loan is accelerated, Seller shall have all rights and remedies permitted by law, including the right to foreclose its mortgage.

(b)     Seller. If Seller fails to perform timely this Agreement other than may be caused by any delay or inability to obtain approval by the United States Bankruptcy Court as set forth herein, and such failure continues thirty (30) days after receipt of written notice thereof from Buyer, Buyer may declare Seller in default. In the event of such default by Seller, Buyer may elect, as Buyer's sole remedies, to either (i) terminate this Agreement whereupon the Deposit shall be returned to Buyer, or (ii) pursue specific enforcement of Seller's obligations under this Agreement. In the event that specific performance is unavailable due to the intentional actions of Seller, then, in addition to the return of its Deposit, Buyer shall be entitled to recover from Seller any and all of its actual out of pocket costs incurred by Buyer in connection with Seller's default hereunder.

20.     **Litigation**. In connection with any litigation arising out of this transaction, or the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to recover from the party not prevailing its reasonable costs and attorney, paralegal and experts' fees in connection with all proceedings and all levels of proceedings. This section shall survive the Closings or the earlier termination of this Agreement.

21.     **Survival**. All representations and warranties of the Seller made in this Agreement, as well as any other provisions hereof which relate to matters extending beyond the Closings under this Agreement, shall survive each Closing and delivery of each deed.

22.     **Notices**. All notices and other communications relating to this Agreement shall be written and sent (a) by personal delivery, (b) by commercial courier, (c) certified United States Mail, return receipt requested, or (d) by fax, to the following addresses:

|  |  |
|---|---|
| As to Buyer: | Agape Senior, LLC<br>Att: Rev. Scott Middleton, CEO<br>1053 Center Street<br>West Columbia 29169<br>Phone:(803)802-0556<br>Fax: (803)-802-0558 |
| with a copy to: | Palmetto Law Associates, LLC<br>1171 Market Street Suite 204<br>Ft. Mill SC 29708<br>Phone:(803) 802-1989<br>Fax:(803) 802-2786 |

As to Seller:           Gold Hill Enterprises, LLC
Att: David Jennings, Partner
P.O. Box 1435
Phone: (248) 988-8896
Fax: (248) 988-8867

with a copy to:         Mr. Bayles Mack, Esq.
101 Allison Street
Fort Mill, SC 29715-2343
Phone: (803) 547-2031
Fax:

Notices shall be effective upon actual receipt. Any party may change the address to which notices are to be sent to such party by written notice to the other party(ies) specifying such change of address. Seller's and Buyer's attorneys are hereby authorized to send and receive notices hereunder on behalf of their respective clients.

23.    **Non-Foreign Status**. Seller acknowledges that §1445 of the Internal Revenue Code of 1954, as amended, requires that a purchaser of real property from a "foreign person" withhold at closing and pay to the Internal Revenue Service a portion of the amount realized by the seller. Seller agrees to provide at closing an affidavit of Seller, or Seller's principal partner, trustee or officer if Seller is not an individual, in form required by Buyer, setting forth sufficient facts to establish whether or not Seller is a "foreign person" within the meaning of §1445, including without limitation Seller's taxpayer identification number and principal residence or business address. If Seller is a "foreign person", Seller agrees to make available to Buyer at each Closing collected funds sufficient to permit compliance by Buyer with the requirements of §1445.

24.    **Interpretation**. This Agreement shall be governed, construed, and enforced in accordance with the law of the State of South Carolina(excluding its conflicts of laws provisions). This Agreement embodies the entire agreement between the parties and supersedes all prior and contemporaneous written, oral, implied, and express agreements and understandings relating to the Land. No covenant, agreement, representation or warranty, whether written or oral, made or executed by any party hereto or its agent shall bind any party hereto unless specifically set forth in this Agreement. The provisions of this Agreement may be waived or amended only by written instrument executed by the party against whom enforcement of the waiver or amendment is sought. Buyer shall have the right, but not the obligation, to waive in writing any unsatisfied obligation of Seller or any other condition precedent to Buyer's obligation to purchase the Land pursuant to this Agreement. The section headings herein contained are for the purposes of identification only and shall not be considered in construing this Agreement. All of the parties to this Agreement have participated freely in the negotiation and preparation of this Agreement and this Agreement shall not be more strictly construed against any one of the parties hereto. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

25.   **Consulting Fee Agreement**.  Whereas Seller and Buyer both acknowledge the extensive consulting work completed by Palmetto Group Consulting, LLC to date, both parties herein agree and acknowledge that in leau of payment out of closing proceeds of a consulting fee, a brokerage fee, or any combination thereof, the Buyer has agreed to pay Palmetto Group Consulting, LLC directly for services rendered and received by the Buyer and/or Seller. In so doing, there shall be no payment by and through this Agreement for Sale and Purchase of Developed Land of either a consulting fee or a brokerage fee out of "Sales Proceeds", and no consulting fee or brokerage fee shall be due from Seller.

26.   **Escrow Agent**.  The terms and conditions set forth in this Agreement shall constitute both an agreement between Seller and Buyer and instructions for Escrow Agent which Agent has been designated as Palmetto Law Associates, LLC.  The Escrow Agent is authorized and agrees by acceptance of the Deposit to hold and deliver the same or the proceeds thereof in accordance with this Agreement.  In the event of doubt as to its liabilities or duties, Escrow Agent may, in its sole discretion and any other provision of this Agreement to the contrary notwithstanding, (a) continue to hold the Deposit or the proceeds thereof until the parties mutually agree to the disbursement thereof, or until a judgment of a court of competent jurisdiction shall determine the rights of the parties thereto, or (b) deliver the Deposit or the proceeds thereof to the Clerk of the Court of the County where the Property is located, and, upon notifying all parties concerned of such action, any liability on the part of Escrow Agent shall fully terminate except to the extent of accounting for any monies or documents previously delivered out of escrow.  The parties agree that Escrow Agent shall not be liable to anyone for erroneous delivery to Buyer or Seller of any money or document held in escrow unless such erroneous delivery shall be due to willful breach of this Agreement or gross negligence on the part of Escrow Agent.  Buyer and Seller agree to indemnify Escrow Agent against, and to hold Escrow Agent harmless from, any and all loss, cost or expense, including reasonable attorney, paralegal and expert fees and disbursements, resulting from Escrow Agent's performance of its obligations and exercise of its prerogatives hereunder.  Escrow Agent shall not be liable for any loss resulting from any default, error, action or omission of Buyer or Seller, loss or impairment of funds in the course of collection or while on deposit resulting from failure or suspension of the depository institution, or Escrow Agent's compliance with any legal process, order or judgment of any court, whether or not subsequently vacated or modified.  Buyer and Seller acknowledge that Escrow Agent shall not be liable for any loss arising from the fact that the common escrow account maintained by Escrow Agent for this and other matters may cause the aggregate amount of any individual depositor's account to exceed applicable deposit insurance coverage.  Escrow Agent shall be permitted to resign, in which event the parties shall promptly appoint a substitute escrow agent and direct the Escrow Agent to transfer the Deposit to the substitute escrow agent. The provisions of this section shall survive the Closing or the earlier termination of this Agreement and may not be amended without the prior written consent of Escrow Agent.

27.   **Severability**.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, applicable law.  If any provision of this Agreement or the application thereof to any person or circumstances shall be invalid or unenforceable for any reason, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected and shall be enforced to the greatest extent permitted by law.

28.   **Relationship**.  Nothing contained in this Agreement shall be construed to be or to create a partnership, joint venture, or relationship between Seller and Buyer other than as Buyer

and Seller of real property in accordance with this Agreement. This Agreement shall bind, inure to the benefit of, and be enforceable by the parties hereto and their respective heirs, personal representatives, successors and assigns.

29.   **Submission, Effective Date**.   The submission by Buyer to Seller of this Agreement in an unsigned form shall be deemed to be a submission solely for Seller's consideration and review. Such submission shall have no binding force and effect, shall not constitute an option or an offer, and shall not confer any rights upon either party or impose any obligations upon either party irrespective of any reliance thereon, change of position or partial performance unless and until Buyer and Seller shall have both executed this Agreement and delivered the same to each other. "Effective Date" means the last date that the last signatory for either Buyer or Seller executes this Agreement. Any reference in this Agreement to a time period of less than six (6) days shall, in the computation thereof, exclude Saturdays, Sundays, and legal holidays. Any time period provided for herein which ends on a Saturday, Sunday or legal holiday shall automatically extend through and including the next business day.

30.   **Exhibits**.   All exhibits referenced in this Agreement are hereby incorporated into this Agreement for all purposes and made a part hereof.

31.   **Confidentiality**.   Seller and Buyer agree to keep all discussions and negotiations with respect to this transaction, which shall include, without limitation, the terms of this Agreement, in strictest confidence and shall not disclose the same (except as may be otherwise required by law) with exception to such party's lenders, attorneys or professional advisors who are actively and directly participating in the transaction, each of whom will be informed by the parties of the confidential nature of this transaction and all discussions, negotiations and terms thereof, be provided with a copy of this provision, and agree to observe the same terms and conditions set forth herein as if specifically named a party hereto.

[SIGNATURES FOLLOW]

**IN WITNESS WHEREOF,** Buyer and Seller have executed this Agreement on the date(s) set forth below.

Signed, sealed and delivered in the presence of the following witnesses:

**SELLER:**

**Gold Hill Enterprises, LLC**, a South Carolina Limited Liability Company

By: _____

_____
Signature of Witness

_____
Printed Name of Witness

Printed Name: David Jennings

Title:  Manager

Signature Date:  _8_/_5_/_11_____ , 2011

(SEAL)

_____
Signature of Witness

_____
Printed Name of Witness
PAULA S AUSTIN

By: _____

Printed Name: Kathryn Jennings

_____
Signature of Witness

_____
Printed Name of Witness

Title:  Manager

Signature Date:  _8_/_5_____ , 2011

(SEAL)

_____
Signature of Witness

_____
Printed Name of Witness
PAULA S AUSTIN

[BUYER'S SIGNATURES FOLLOW]

Signed, sealed and delivered in the
presence of the following witnesses:

**BUYER:**

**AGAPE SENIOR, LLC**, a South Carolina
Limited Liability Company

_____
Signature of Witness

_____
Printed Name of Witness

_____
Signature of Witness

_____
Printed Name of Witness

By: _____
Printed Name: Dan Belk
Title: Development President

Signature Date: _____8·4-11_____, 2011

(SEAL)

Signed, sealed and delivered in the
presence of the following witnesses:

_____
Signature of Witness

_____
Printed Name of Witness

_____
Signature of Witness

_____
Printed Name of Witness

By: _____
Printed Name: _____
Title: Director

Signature Date: _____, 2011

(SEAL)

## RECEIPT AND AGREEMENT

The Escrow Agent acknowledges receipt of Cash Deposit in the amount of Twenty-Five Thousand Dollars ($25,000) as the Deposit under the Agreement between Agape Senior, LLC, and Gold Hill Enterprises, LLC, a South Carolina Limited Liability Company dated effective as of _____, 2011 (the "Agreement").

Signed, sealed and delivered in the
presence of the following witnesses:

**ESCROW AGENT:**
**Palmetto Law Associates, LLC**
**1171 Market Street Suite 204**
**Ft. Mill SC 29708**
**Attention: Phil Murdock, Jr., Of Counsel**
**Phone:(803) 802-1989**
**Fax:(803) 802-2786**
_____                     By:_____
Signature of Witness

_____
Printed Name of Witness

Printed Name:_____

_____

Title:_____

Signature of Witness

Signature Date: _____, 2011
_____
Printed Name of Witness

(SEAL)



## GOLD HILL COMMONS USAGE CHART

| | SIZE | PERCENT USED |
|---|---|---|
| RETAIL | 65.46 ACRES ± 15% | 22.80% |
| HOTEL | 12.00 ACRES ± 15% | 4.19% |
| OFFICE | 52.01 ACRES ± 15% | 18.14% |
| BUSINESS FLEX: LT. INDUSTRIAL | 23.82 ACRES ± 15% | 8.30% |
| MULTIFAMILY | 40.33 ACRES ± 15% | 14.07% |
| MIXED USE | 11.31 ACRES ± 15% | 3.88% |
| GEN. INFRASTRUCTURE | 19.65 ACRES ± | 6.89% |
| OPEN SPACE | 62.31 ACRES ± | 21.73% |

* NOTE: MAXIMUM OF 526 RESIDENTIAL LOTS ARE ALLOWED.

** NOTE: ADDITIONAL OPEN SPACE REQUIREMENTS TO BE MET WITHIN INDIVIDUAL LAND USE AREAS.

### LEGEND

| | |
|---|---|
| ORANGE | RETAIL |
| RED | HOTEL |
| BLUE | OFFICE |
| LIGHT PURPLE | BUSINESS FLEX: LT. INDUSTRIAL |
| LIGHT RED | MULTIFAMILY |
| YELLOW | MIXED USE |
| GREEN | OPEN SPACE |
| | TRAIL |

NOTE:
THE TRAIL LOCATIONS SHOWN IN THE OPEN SPACE ARE SCHEMATIC. ACTUAL TRAIL LOCATIONS WILL BE DETERMINED AS PART OF THE PRELIMINARY PLAT PROCESS.

GOLD HILL COMMONS

GOLD HILL ENTERPRISES, LLP

PLANNED DEVELOPMENT (PD) PLAN
(REZONING)

1 / 1